# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-08-00149-CV

**Southern Plastics, Inc., Appellant**

**v.**

**Susan Combs, Comptroller of Public Accounts of the State of Texas,
and Greg Abbott, Attorney General of the State of Texas, Appellees**

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 126TH JUDICIAL DISTRICT
NO. D-1-GN-06-000047, HONORABLE MARGARET A. COOPER, JUDGE PRESIDING**

## M E M O R A N D U M   O P I N I O N

This is an appeal from a summary judgment in favor of the Comptroller in a suit to recover a sales tax refund. We will affirm the judgment.

## BACKGROUND

At relevant times, appellant Southern Plastics, Inc., has operated a plant near Kilgore, Texas, where it manufactures plastic closures, such as caps and lids, which it sells to companies that manufacture and sell beverages, personal care products, and other household products. Southern Plastics manufactures the plastic closures by loading raw materials, such as resins and colorants, into molding machines, heating them, and injecting them into molds. Southern Plastics also manufactures liners for the insides of some of the plastic closures. It bonds a type of paper called "pulp" to foil or wax paper in a machine called a "laminator," uses a die to cut or punch out pieces of the laminated paper in the size and shape of the closure, and then inserts the liner into the closure.

The Comptroller conducted a sales tax audit of Southern Plastics for the period between November 1, 1999, and October 31, 2002. During this period, Southern Plastics contracted with the City of Kilgore to periodically remove and dispose of certain waste from its plant. It is undisputed that there were essentially four sources or categories of waste removed by the City or its subcontractors:

- Waste from the process of manufacturing the plastic closures and liners, including scrap plastic, remnants of pulp, and "skeletons" or "webbing" of the laminated sheets from which the closure liners were punched.

- Waste from discarded wrapping or packaging materials (e.g., cardboard boxes and cores, wooden pallets, banding, and shrink wrap) it received with incoming shipments of raw materials.

- Waste from damaged or unusable wrapping or packaging materials used to prepare its finished products for shipment to customers, such as damaged boxes, damaged pallets, and excess shrink wrap.

- Waste from Southern Plastics's offices, including shredded paper and cardboard boxes that held copy paper, and waste from food and beverages consumed by employees in a break room area.

Southern Plastics commingled these categories of waste before removal. It paid a single charge to the City for removal of the commingled waste that did not differentiate among the relative amounts contributed from each of the four waste categories. Southern Plastics also paid sales tax on the full amount of each such charge during the audit period. These sales tax payments totaled $4,872.78 for the audit period.

Subsequently, Southern Plastics requested from the Comptroller a refund of all the sales taxes it had paid for the City's waste removal services during the audit period. It claimed

2

the taxes had been paid in error because the waste was "industrial solid waste" for which removal costs are not subject to the sales tax. *See* Tex. Tax Code Ann. § 151.0048(a)(3)(b) (West 2008); 34 Tex. Admin. Code § 3.356(a)(3)(E) (2009) (Tex. Comptroller of Pub. Accts.). The Comptroller denied the requested refund and Southern Plastics's ensuing motion for rehearing. Southern Plastics then filed suit under chapter 112 of the tax code seeking a refund. *See* Tex. Tax Code Ann. §§ 112.151-.155 (West 2008). It also asserted a claim under section 2001.038 of the administrative procedures act for a declaration that the Comptroller's interpretation of its rule defining "industrial solid waste" was itself a "rule" under the APA and invalid because the Comptroller had failed to comply with the APA's rulemaking requirements in adopting it. *See* Tex. Gov't Code Ann. § 2001.038 (West 2008).

Southern Plastics and the Comptroller[1] filed cross-motions for summary judgment under the "traditional" standard that joined issue on whether Southern Plastics was entitled to a refund. In its motion, Southern Plastics also sought summary judgment on its declaratory-judgment claim under the APA. The district court granted the Comptroller's summary-judgment motion, denied Southern Plastics's motion, and rendered final judgment for the Comptroller as to all of Southern Plastics's claims. This appeal followed.

---

[1] Because the interests of the Comptroller and the Attorney General in the litigation align, we hereafter refer to them collectively as the "Comptroller." *See* Tex. Tax Code Ann. § 112.053 (West 2008) (requiring the Comptroller and the Attorney General to be named as defendants in suit brought pursuant to chapter 112 of the tax code).

**ANALYSIS**

In three issues on appeal, Southern Plastics contends that the district court erred in rendering summary judgment for the Comptroller on Southern Plastics's refund and APA claims and in denying it summary judgment on those claims.

**Standard of review**

We review the district court's summary judgment de novo. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005); *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003). Summary judgment is proper when there are no disputed issues of material fact and the movant is entitled to judgment as a matter of law. Tex. R. Civ. P. 166a(c). When reviewing a summary judgment, we take as true all evidence favorable to the non-movant, and we indulge every reasonable inference and resolve any doubts in the non-movant's favor. *Valence Operating Co.*, 164 S.W.3d at 661; *Knott*, 128 S.W.3d at 215.

When parties file cross-motions for summary judgment on overlapping issues and the trial court grants one motion and denies the other, an appellate court should review the summary-judgment evidence supporting both motions and determine all questions presented. *FM Props. Operating Co. v. City of Austin*, 22 S.W.3d 868, 872 (Tex. 2000). The appellate court "should render the judgment that the trial court should have rendered." *Id.*

Our review of the district court's summary-judgment rulings turns on construction of the tax code and the Comptroller's rules. Statutory construction presents a question of law that we review de novo. *See State v. Shumake*, 199 S.W.3d 279, 284 (Tex. 2006). Our primary objective in statutory construction is to give effect to the legislature's intent. *Id*. We seek that intent "first

4

and foremost" in the statutory text. *Lexington Ins. Co. v. Strayhorn*, 209 S.W.3d 83, 85 (Tex. 2006). We rely on the plain meaning of the text, unless a different meaning is supplied by legislative definition or is apparent from context, or unless such a construction leads to absurd results. *City of Rockwall v. Hughes*, 246 S.W.3d 621, 625-26 (Tex. 2008); *see* Tex. Gov't Code Ann. § 311.011 (West 2005) ("[w]ords and phrases shall be read in context and construed according to the rules of grammar and common usage"). However, with regard to a statute that an agency is charged with enforcing, we give "serious consideration" to the agency's construction of it, so long as that construction is reasonable and consistent with the statutory language, and this is particularly true when the statute involves complex subject matter within the agency's area of expertise. *See First Am. Title Ins. Co. v. Combs*, 258 S.W.3d 627, 632 (Tex. 2008); *cf. Rylander v. Fisher Controls Int'l, Inc.*, 45 S.W.3d 291, 302 (Tex. App.—Austin 2001, no pet.) (courts "do not defer to administrative interpretation in regard to questions which do not lie within administrative expertise or deal with a nontechnical question of law").

"We construe administrative rules, which have the same force as statutes, in the same manner as statutes." *Rodriguez v. Service Lloyds Ins. Co.*, 997 S.W.2d 248, 254 (Tex. 1999). "Unless the rule is ambiguous, we follow the rule's clear language." *Id.* However, we defer to an agency's interpretation where there is vagueness, ambiguity, or room for policy determinations in the regulation—i.e., unless the administrative interpretation is "plainly erroneous or inconsistent with the regulation." *See id.* at 254-55 (quoting *Public Util. Comm'n v. Gulf States Util. Co.*, 809 S.W.2d 201, 207 (Tex. 1991)).

**Refund claim**

As the plaintiff in a tax refund case, Southern Plastics had the burden of proving, by a preponderance of the evidence, that it is entitled to a refund of the sales tax it paid on the City's waste removal services because those services were not subject to tax. *GATX Terminals Corp. v. Rylander*, 78 S.W.3d 630, 634-35 (Tex. App.—Austin 2002, no pet.). In its first issue, Southern Plastics argues that it is entitled to summary judgment on its refund claim "[b]ecause the uncontroverted evidence shows that all but a de minimis portion of Appellant's waste meets the Comptroller's definition of industrial solid waste." Alternatively, in its third issue, Southern Plastics contends that the Comptroller did not establish her entitlement to summary judgment on that claim.

Section 151.0101, subsection (a) of the tax code enumerates the "taxable services" that are subject to the Texas sales and use tax. *See* Tex. Tax Code Ann. § 151.0101(a) (West 2008). Subsection (b) of that section provides that "[t]he comptroller shall have exclusive jurisdiction to interpret Subsection (a) of this section." *Id.* § 151.0048(b). Among the "taxable services" listed in subsection (a) are "real property services." *See id.* § 151.0101(a)(11). The tax code defines "real property services" to include such services as landscaping, lawn or tree care, surveying, janitorial services, and:

> the removal or collection of garbage, rubbish, or other solid waste other than
>
> (A)    hazardous waste;
>
> (B)    *industrial solid waste*;
>
> (C)    waste material that results from an activity associated with the exploration, development, or production of oil, gas, geothermal resources, or any other

6

substance or material regulated by the Railroad Commission of Texas under Section 91.101, Natural Resources Code;

(D)     domestic sewage or an irrigation return flow, to the extent the sewage or return flow does not constitute garbage or rubbish; and

(E)     industrial discharges subject to regulation by permit issued pursuant to Chapter 26, Water Code. . . .

*Id.* § 151.0048(a)(3) (West 2008) (emphasis added).

Comptroller rule 3.356 addresses the taxability of real property services. *See* 34 Tex. Admin. Code § 3.356. Rule 3.356 defines "garbage or other solid waste" and "industrial solid waste" as follows:

(3)     Garbage or other solid waste—Waste; refuse; sludge from a waste treatment plant, a water supply treatment plant, or an air pollution control facility; and other discarded material, including solid, liquid, semisolid, or contained gaseous material, resulting from residential, industrial, municipal, commercial, mining, and agricultural operations, and resulting from community and institutional activities. The term does not include any of the following:

* * *

(E)     industrial solid waste, as that term is defined in Health and Safety Code, Chapter 361, with the exception of industrial solid waste which meets the definition of garbage or municipal solid waste.

*Id.* § 3.356(a)(3)(E). Chapter 361 of the health and safety code is the Solid Waste Disposal Act. *See* Tex. Health & Safety Code Ann. § 361.001 (West 2001). The Solid Waste Disposal Act defines "industrial solid waste" as:

7

solid waste resulting from or incidental to a process of industry or manufacturing, or mining or agricultural operations.

*Id.* § 361.003(16) (West 2001). The parties' dispute centers primarily on the proper interpretation of *"resulting from* or *incidental to* a process of industry or manufacturing," as incorporated into rule 3.356(a)(3)(E).[2] *See id.* (emphasis added).

---

[2] There is no dispute that Southern Plastics's waste during the audit period was "solid waste." The Act's definition of "solid waste" generally includes "garbage, rubbish, refuse, sludge from a waste treatment plant, water supply treatment plant, or air pollution control facility, and other discarded material, including solid, liquid, semisolid, or contained gaseous material resulting from industrial, municipal, commercial, mining, and agricultural operations and from community and institutional activities." Tex. Health & Safety Code Ann. § 361.003(34), (35) (West 2001). "Garbage" under the Act is defined much more narrowly than in rule 3.356(a)(3): "solid waste that is putrescible animal and vegetable waste materials from the handling, preparation, cooking, or consumption of food, including waste materials from markets, storage facilities, and the handling and sale of produce and other food products." *Id.* § 361.003(10). Beyond that distinction, the Act's definition of "solid waste" is largely identical to rule 3.356(a)(3)'s definition of "garbage or other solid waste." Thus, rule 3.356(a)(3) implies that "industrial solid waste" is a subcategory of "garbage or other solid waste."

For this reason, rule 3.356(a)(3)'s provision making taxable "industrial solid waste" that "meets the definition of garbage or municipal solid waste" presumably cannot refer to the preceding definition of "garbage or other solid waste" from which "industrial solid waste" is excluded; otherwise, the "industrial solid waste" exclusion would be a circular nullity. *See Fleming Foods of Tex., Inc. v. Rylander*, 6 S.W.3d 278, 284 (Tex. 1999) (statutes are construed according to their plain language unless doing so would lead to absurd results). Southern Plastics argues that the provision necessarily incorporates the Act's narrower definition of "garbage" and its definition of "municipal solid waste," further observing that rule 3.356 contains no definition of "municipal solid waste" while the Act does. *See* Tex. Health & Safety Code Ann. § 361.003(20) ("'Municipal solid waste' means solid waste resulting from or incidental to municipal, community, commercial, institutional, or recreational activities, and includes garbage, rubbish, ashes, street cleanings, dead animals, abandoned automobiles, and other solid waste other than industrial solid waste."). In several prior rulings, the Comptroller has agreed that rule 3.356(a)(3)(E)'s reference to "garbage" incorporates the Act's definition of that term. *See, e.g.*, Tex. Comptroller of Pub. Accounts, STAR Document No. 200312389L (effective Dec. 30, 2003) ("It is the definition of garbage in Chapter 361 of the Health and Safety Code which the Tax Division maintains controls the taxability of waste removal services in this case."); Hearing No. 42,854, STAR Document No. 200404692H (Apr. 16, 2004)

8

Southern Plastics argues that the plain meaning of waste "resulting from" or "incidental to" its manufacturing process encompasses not only its waste from the actual manufacturing of plastic closures and liners,[3] but also discarded wrapping and packaging from its incoming and outgoing shipments, and even its office waste. It cites definitions from dictionaries and case law to the effect that "resulting from" means a "consequence" or "effect of," or "arising from," while "incidental to" means "closely related to" or even "peripheral."[4] In Southern Plastics's view, "waste generated by [its] process of sorting, segregating, storing and using its raw materials and supplies and waste generated by its process of wrapping and packaging finished products for shipping to customers" fall within those definitions. Additionally, Southern Plastics observes that the Texas Commission on Environmental Quality—the state agency charged with enforcing and implementing the Solid Waste Disposal Act—apparently considers all waste from a manufacturing plant to be "industrial solid waste" that must be classified according to TCEQ regulations. *See* 30 Tex. Admin. Code § 335.508(3) (2009) (Tex. Comm'n on Envtl. Quality) (all "plant trash," including trash from "facility offices" and "cafeteria," constitutes Class 2 industrial solid waste); Tex. Comm'n on Envtl. Quality, Instructions for Completing the Notification for

---

("[i]n Rule 3.356(a)(3)(E), the Comptroller has adopted for sales tax purposes the statutory definition of industrial solid waste in Tex. Health and Safety Code, Chapter 361 ["Solid Waste Disposal Act"]"). Although the Comptroller cites rule 3.356(a)(3)(E)'s "garbage" exclusion to emphasize that she has not unqualifiedly adopted the Act's definition of "industrial solid waste" in her rule, we do not understand her to be contending that Southern Plastics's waste, if "industrial solid waste," is nonetheless taxable because it is also "garbage." Instead, she joins issue with Southern Plastics regarding the breadth of "industrial solid waste" under rule 3.356(a)(3)(E).

[3] E.g., scrap plastic, remnants of pulp, and liner "webbing."

[4] *Merriam-Webster's Collegiate Dictionary* 587, 999 (10th ed. 1994); Bryan A. Garner, *A Dictionary of Modern Legal Usage* 430 (2d ed. 1995).

9

Hazardous or Industrial Waste Management Form (TCEQ-00002) 22 (2009) (*available at* www.tceq.state.tx.us/assets/public/permitting/rrr/forms/0002inst.pdf) ("all wastes . . . even office trash" produced by a facility that "make[s] a product for wholesale according to an organized plan and with a division of labor, change[s] materials by processing them, or substantially support[s] either of those activities" are "industrial waste."). Thus, Southern Plastics reasons, these wastes are all non-taxable "industrial solid waste." Southern Plastics concedes, however, that food waste from its employee break room was taxable because it constituted "garbage" under the Solid Waste Disposal Act. *See* Tex. Health and Safety Code Ann. § 361.003(10) (West 2001); 34 Tex. Admin. Code § 3.356(a)(3)(E).[5] This taxable waste can be disregarded, Southern Plastics asserts, because the summary-judgment evidence conclusively establishes that it was de minimis—less than one percent of the plant's total waste stream during the audit period.[6]

The Comptroller counters, first, that Southern Plastics failed to comply with the administrative or recordkeeping requirements for claiming that any portion of its waste during the audit period was non-taxable. Rule 3.356 generally requires persons providing "garbage or other solid waste" services to obtain a tax permit and collect and remit sales and use taxes on all charges for such services. 34 Tex. Admin. Code § 3.356(b). Subsection (h) of the rule sets forth the procedure for taxpayers to assert their rights against having sales tax assessed on collection of waste that is wholly or partly non-taxable:

---

[5] *See supra* note 2.

[6] *See* Tex. Comptroller of Pub. Accounts, Hearing No. 39,987, STAR Document No. 200208491H (Aug. 21, 2002).

> (h) Garbage collection services that may be excluded from tax. Persons providing collection services for customers having waste excluded from the definition of "garbage or other solid waste" may accept an exemption certificate from the customer in lieu of tax. The exemption certificate must state the type of waste being excluded, and that either the waste to be collected is totally excludable or that the customer has both taxable and nontaxable waste and the customer will be responsible for accruing tax on that portion of the charge which represents taxable services. The customer may use any reasonable allocation for reporting tax on taxable services which is supportable by books and records.

*Id.* § 3.356(h). The Comptroller points out that Southern Plastics did not present the City with an exemption certificate, but paid sales tax on the entirety of the waste removal services the City provided during the audit period. *See id.* The Comptroller further asserts that Southern Plastics cannot, as a matter of law, "show how much of the waste it generated during the audit period was industrial solid waste and how much was not" (i.e., a "reasonable allocation" under 3.356(h)) because the summary-judgment evidence conclusively establishes that Southern Plastics did not maintain any "books and records" that could support its proposed tax treatment of the City's waste removal services. *See id.*; *see also* Tex. Tax Code Ann. § 111.0041 (West 2008) (requiring taxpayer to retain records for inspection by the comptroller or the attorney general for period of four years).[7]

---

[7] In some of her pleadings, including her summary-judgment motion, the Comptroller refers to the asserted failure of Southern Plastics to comply with rule 3.356(h)'s recordkeeping requirement as a failure to meet its "burden" to recover a sales tax refund. In its third issue, Southern Plastics characterizes these statements as misplacing the Comptroller's burden in her traditional summary-judgment motion, requiring Southern Plastics to prove its entitlement to a refund rather than requiring the Comptroller to conclusively negate its entitlement. We understand the Comptroller's position instead to be that Southern Plastics cannot, as a matter of law, recover on its refund claim because the summary-judgment evidence conclusively establishes that it did not maintain or provide "books and records" that could support its desired tax treatment of its waste, as required by rule 3.356(h).

Additionally, the Comptroller asserts that Southern Plastics's office waste and packaging waste from incoming or outgoing shipments are not "resulting from" or "incidental to" the plant's manufacturing processes as she has interpreted rule 3.356(a)(3)(E).[8] In several prior rulings and policy statements, the Comptroller has interpreted "industrial solid waste" under rule 3.356(a)(3)(E) to be limited to waste generated by the "actual manufacturing process" and to exclude shipping refuse or office waste.[9] The Comptroller explains that her interpretation is based on what she perceives as the public policy underlying the statutory exclusion of "industrial solid waste," "hazardous waste," and other exclusions from taxable "garbage, rubbish, or other

---

[8] The Comptroller does not appear to dispute that Southern Plastics's waste generated by the manufacturing process itself would be "industrial solid waste." However, she contends that Southern Plastics's failure to comply with the recordkeeping requirements of rule 3.356(h) forecloses its claim to a refund of any portion of the sales taxes it paid on waste removal during the audit period.

[9] *See* Tex. Comptroller of Pub. Accounts, STAR Document No. 9201L1162A01 (effective Jan. 30, 1992) (even while "manufacturers must package and ship their products," "shipping refuse relating to . . . manufacturing operations (i.e, packing and unpacking material, broken pallets, etc.)" is not "industrial solid waste"); Tex. Comptroller of Pub. Accounts, STAR Document No. 9209L1193F12 (effective Sept. 25, 1992) ("Industrial solid waste, as that term is used in Rule 3.356, means waste products resulting from the actual manufacturing process, such as sawdust from lumber mills, slag from a steel manufacturing process, or waste lumber [at a plant that manufactures wooden doors and shingles]. 'Industrial solid waste' does not mean empty paint cans or the discarded shipping refuse in which raw materials were received. Manufacturers can have much more taxable waste than just the paper generated by the administrative staff."); Hearing No. 33,600, Tex. Comptroller of Pub. Accounts, STAR Document No. 9601H1390B11 (Jan. 16, 1996) (cardboard cores used to support aluminum coils in shipment to plant that used coils as raw material in manufacturing "are not waste products from an actual manufacturing process [but] fit into the category of shipping refuse, and the collection of those cores is a taxable real property service."); Hearing No. 43,049, Tex. Comptroller of Pub. Accounts, STAR Document No. 200610888H (Apr. 20, 2004) (citing Hearing No. 33,600 in ruling that "discarded packaging and wrapping material, including aluminum bandings, cardboard boxes, and plastic sheeting" was not "industrial solid waste"). *See also* Tex. Comptroller of Pub. Accounts, STAR Document No. 200104170L (effective Apr. 11, 2001) (food leftovers generated by office employees are not industrial solid waste).

solid waste"—to avoid imposing a tax disincentive against desirable waste clean-up activities. *See* Tex. Tax Code Ann. § 151.0048(a)(3). The core legislative concern reflected in these provisions, in the Comptroller's view, was with hazardous, potentially hazardous, or other waste perceived to create pronounced environmental threats, as is frequently true of manufacturing waste. *See* House Research Organization, Bill Analysis, Tex. H.B. 1814, 72d Leg., R.S. (1991) ("[T]o avoid imposing a tax disincentive on desirable waste-disposal activities," taxable waste removal does not include removal of "hazardous waste, industrial solid waste, domestic sewage and certain other wastes"). By contrast, the Comptroller maintains, the legislature manifested its intent in section 151.0048(a)(3) that ordinary "garbage" and "rubbish" be taxed. The Comptroller also emphasizes that section 151.0048(b) of the tax code grants her "exclusive jurisdiction" to construe the provisions defining taxable services, and that her construction of statutory or rule language defining taxable services should control over that of the TCEQ in the event of a conflict.

Besides condemning the Comptroller's interpretation of "industrial solid waste" as inconsistent with the plain text of rule 3.356(a)(3)(E), Southern Plastics questions both the consistency with which the Comptroller has applied her interpretation and her underlying rationales. It cites language from some of the Comptroller's policy statements and rulings suggesting an erroneous view that the Solid Waste Disposal Act does not *regulate* any waste from manufacturing facilities other than hazardous waste and industrial solid waste resulting from actual manufacturing activities.[10] As for the Comptroller's "exclusive jurisdiction" to construe the definitions of "taxable

---

[10] *See* Tex. Comptroller of Pub. Accounts, STAR Document No. 9201L1162A01 (effective Jan. 30, 1992) ("Packaging or shipping refuse is free from regulation" under the Solid Waste Disposal Act); Tex. Comptroller of Pub. Accounts, STAR Document No. 9209L1193F12 (effective

13

services," Southern Plastics contends that the Comptroller has exercised her jurisdiction to adopt a statutory definition of "industrial solid waste" from the Solid Waste Disposal Act that the TCEQ or its predecessors have interpreted and administered for decades. Having opted to adopt this definition, Southern Plastics suggests, the Comptroller is bound to follow it. *See Rodriguez*, 997 S.W.2d at 255 (agency is bound to follow its own rules and procedures).

Regarding rule 3.356(h)'s record-keeping requirement, Southern Plastics cites summary-judgment evidence of invoices and receipts it received in connection with the City's waste removal services during the audit period. However, these documents reflect only that Southern Plastics periodically paid a fee to the City or its subcontractors for waste removal services, but do not indicate the composition of the plant's waste stream. The Comptroller presented summary-judgment evidence that, during her audit, Southern Plastics was unable to provide her auditor any other books or records regarding its waste stream other than some photographs of its waste.[11] As evidence of the composition of its waste stream during the audit period, Southern Plastics has relied primarily on two separate one-week studies performed by company employees several years after the audit period. The

Sept. 25, 1992) ("Shipping refuse, empty paint, glue, and varnish containers are not regulated" under the Act). *Cf.* 30 Tex. Admin. Code § 335.508(3) (Tex. Comm'n on Envtl. Quality) (all "plant trash," including trash from "facility offices" and "cafeteria," constitutes Class 2 industrial solid waste).

[11] The Comptroller presented the affidavit of Robert H. Krahn, the auditor who performed the Comptroller's sales tax audit of Southern Plastics's Kilgore plant. Krahn testified that he "examined the books and records of Southern Plastics" and that "[d]uring the audit, Southern Plastics did not show me books and records documenting or classifying its waste stream for the audit period [or] . . . show me any documentation showing that the waste generated during the audit period was industrial solid waste." Krahn explained that "[t]he only documentation I recall seeing were two pictures showing office trash, broken pallets, paper, or laminate skeletons resulting from the manufacturing process." Krahn further testified that he examined the invoices for the waste removal services Southern Plastics purchased from the City during the audit period. These invoices, as noted, do not reflect the composition of Southern Plastics's waste stream.

14

first of the studies was performed by Ed Casto, Maintenance and Process Engineer for Southern Plastics. Casto summarized his findings in an affidavit dated May 23, 2005. The second study, which covered a period between December 4 and 12, 2006, was performed by Ron Smith, Logistics Manager for Southern Plastics. Smith summarized his findings in an affidavit dated February 23, 2007. According to these affidavits, each study determined that, during the period of the study, less than one percent of the Southern Plastics waste removed by the City came from the office, administrative, or break room areas. Smith further determined that less than three percent of total waste collected by the City during his study came from discarded packaging or wrapping from in-bound raw materials. Both Castro and Smith averred that the processes Southern Plastics used to manufacture plastic closures during their study was "substantially" the same as or similar to that used during the audit period.

Southern Plastics also presented the May 2007 deposition testimony from John Steven Clarke, another employee who was familiar with Southern Plastics's manufacturing processes, as well as Smith's deposition. Clarke testified that waste generated from the packaging of outgoing shipments comprises about one-half of one percent of Southern Plastics's total waste. He added—considering that office or administrative waste accounts for less than one percent of waste, and waste from incoming shipments accounted for three percent—that waste from the manufacturing process itself accounts for over ninety-five percent of Southern Plastics's total waste. Clarke further testified that Southern Plastics had substantially the same volume of business, nearly the same number of employees, and the same number of machines in operation during the audit period and the one-week studies as it did at the time of his deposition. On the other hand, Clarke and Smith both

15

acknowledged that the volume and composition of Southern Plastics's waste stream varies somewhat from week-to-week and seasonally.

The Comptroller points out that Southern Plastics's refund claim hinges not on proof of what its waste stream actually was during the audit period, per se, but whether Southern Plastics's proposed tax treatment of its waste removal is "reasonable" and "supportable by books and records" as required by rule 3.356(h). *See* 34 Tex. Admin. Code § 3.356(h). As for the two studies on which Southern Plastics primarily relies, the Comptroller urges that "all these studies prove is what type and how much waste Southern Plastics generated during the two weeks that were studied"—which, she adds, were conducted years after the audit period. She characterizes the studies as narrow "single point in time checks" that provide no objective means of verifying the actual waste stream at that time, much less during the audit period, further observing that both Smith and Clarke admitted that Southern Plastics's waste stream had weekly and seasonal variations.

The Comptroller's construction of the "books and records" requirement of rule 3.356(h) to preclude reliance on Southern Plastics's two after-the-fact, one-week studies (or similar attempts to replicate the composition of Southern Plastics's waste stream during the audit period) is not plainly erroneous or inconsistent with the regulation. The Comptroller has construed "supportable by books and records" to require a more contemporaneous, precise and objective record of Southern Plastics's waste stream during the audit period that would enable her to verify the basis for the company's claims that all or part of its waste was non-taxable. The Comptroller acted within her discretion here in determining that Southern Plastics's documentation was insufficient to satisfy the rule's requirements. *See Gulf States Utils. Co.*, 809 S.W.2d at 207 (agency's interpretation of its

16

own rules is entitled to deference unless it is plainly erroneous); *see also* Tex. Tax Code Ann. § 111.0041 (four-year record retention requirement).

On the other hand, we conclude that Southern Plastics has raised a fact issue as to whether "books and records" exist, or existed during the audit period, that would demonstrate that all waste from its Kilgore plant during the audit period was classified as Class 2 industrial solid waste by the TCEQ. Southern Plastics presented the affidavit of Mark Galliardt, its Environmental Health and Safety Manager. Galliardt explained that his job responsibilities had included ensuring that Southern Plastics's Kilgore plant complied with all state environmental regulations during the audit period. Galliardt testified that, in compliance with the Solid Waste Disposal Act and related rules, Southern Plastics filed a "Notice of Registration" (NOR) with the TCEQ before the audit period and periodically updated it to reflect any changes in its waste stream. According to Galliardt, the waste removed by the City was "classified as Class 2 industrial solid waste under TCEQ regulations and guidelines."[12] He elaborated that the plant also generated other types of waste, some classified as

---

[12] Attached to Galliardt's affidavit was an excerpt from Southern Plastics's NOR, albeit dated May 24, 2006. Beside "Description from Generator," the NOR indicated "General office, cafeteria/breakroom, and misc. nonhaz plant waste/Generated through normal daily plant activities/initial generation began on or after 8/24/92." Galliardt and the NOR do not elaborate further on the relative proportions of each type of source of waste in Southern Plastics's total waste stream.

Southern Plastics also presented a two-page spreadsheet entitled "Southern Waste Inventory," filed with TCEQ, that indicates it was last revised in April 2006. It lists various categories of "Class 2" non-hazardous waste products :

• "Waste cardboard" generated "during packaging of final product prior to shipment."

17

hazardous waste, that were removed or disposed of by entities other than the City. Galliardt added "Because of the relatively small amount of hazardous waste generated by [Southern Plastics] at this plant, it is designated as a 'conditionally exempt small quantity generator' under TCEQ regulations. As such, it is not required to submit regular reports to TCEQ regarding its waste disposal activities" or "to maintain records regarding its Class 2 industrial solid waste disposal activities."[13]

- "Plant Trash" generated in "Office, Lunchrooms." The chart further states, "Any class 2 waste originating in the facility offices, laboratory, plant production area, or food service area that is composed of cardboard, paper, linings, wrappings, paper and/or wooden packaging, uncontaminated food waste, aluminum foil, aluminum scrap, empty containers with a holding capacity of less than 5 gallons, uncontaminated food sweepings."

- "Off Spec Product, Plant refuse" from "General Plant." It further states, "Supplemental Plant Refuse: Any class 2 waste from production, manufacturing or laboratory operations as long as the total amount of the supplemental plant production refuse does not exceed twenty percent of the total plant trash . . . volume or weight, whichever is less. This could include, but is not limited to, such things as metal parts, floor sweepings, and off specification material."

[13] The Comptroller has previously suggested that taxpayers who generate industrial solid waste will ordinarily be required to file documentation with the TCEQ that will suffice "to establish what portion of the waste is nontaxable hazardous waste, nontaxable industrial solid waste, and taxable garbage or municipal solid waste." *See* Tex. Comptroller of Pub. Accounts, STAR Document No. 200104170L (effective Apr. 11, 2001). However, if for some reason such documentation is not required, the Comptroller emphasized that "the waste generator must still establish what portion of their waste stream is nontaxable industrial solid waste versus taxable garbage or municipal waste." *Id.* She further explained:

The waste generator can do this by identifying and documenting in writing those processes that produce the various types and amounts of wastes. For example, a waste generator that is a manufacturer determines that there are 150 office employees and other employees that generate 100 pounds of office trash or garbage (e.g., food leftovers, etc.) that is disposed of on a weekly basis. The incoming purchases of raw materials and other supplies produce another 100 pounds of boxes and other packaging waste for disposal each week. The actual output of industrial solid waste from the manufacturing process is determined to be 200 pounds for disposal each week. Therefore, the waste generator can show in this example that 50 percent of the waste that is disposed of is nontaxable industrial solid waste and 50 percent is taxable

18

For these reasons, our disposition of Southern Plastics's challenge to summary judgment on its refund claim turns on whether the status of its waste during the audit period as Class 2 industrial solid waste under TCEQ regulations controls whether the waste is non-taxable "industrial solid waste" under Comptroller rule 3.356(a)(3)(E). In that regard, rule 3.356(a)(3)(E)'s reference to "industrial solid waste, as that term is defined in Health and Safety Code, Chapter 361 . . . ," is susceptible to at least two interpretations. It could mean that the definition of "industrial solid waste" under rule 3.356(a)(3)(E) tracks whatever the term means in the health and safety code, as interpreted and applied in the context of state environmental regulation. This is the construction advocated by Southern Plastics. Alternatively, "industrial solid waste, as that term is defined in Health and Safety Code, Chapter 361 . . . ," could mean that the Comptroller intended to incorporate the *language* of that statutory definition, which she would then interpret and apply, as a matter of tax policy and administration, and potentially in a manner diverging from its application in the environmental regulatory arena. This is essentially the construction advanced by the Comptroller. We cannot conclude that the Comptroller's construction is plainly erroneous or inconsistent with the regulation, especially against the backdrop of tax code section 151.0048(b)'s mandate that the Comptroller have "exclusive jurisdiction" to interpret the statutory definitions of taxable services. *See* Tex. Tax Code Ann. § 151.0048(b). Although rule 3.356(a)(3)(E) may reflect the Comptroller's

---

garbage or municipal solid waste by using process knowledge of the business operation. Additional documentation that further supports the claim of exemption can be kept; such as photographs of the amount and types of waste that are generated.

*Id.* However, the Comptroller stressed, "A single point in time 'check' of the contents of a dumpster by a waste generator or consultant is not verifiable and is insufficient information to establish what portion of the waste is taxable waste versus nontaxable waste." *Id.*

19

desire for guidance from the environmental regulatory arena concerning the types of waste for which removal should be incentivized by tax policy,[14] its language does not plainly disclaim authority over the ultimate question of whether that waste is taxed. Similarly, we cannot conclude that the Comptroller's interpretation that not all of Southern Plastics's Class 2 industrial solid waste "results from" or is "incidental to" the plant's manufacturing processes under rule 3.356(a)(3)(E) is plainly erroneous or inconsistent with the regulation. At a minimum, the Comptroller does not exceed her authority in concluding that Southern Plastics's office waste and break room waste does not fall within this definition.

Accordingly, the district court did not err in granting summary judgment for the Comptroller as to Southern Plastics's tax refund claim. We overrule Southern Plastics's first and third issues.

**Section 2001.038 claim**

In its second issue, Southern Plastics argues that it is entitled to a declaration under the Administrative Procedure Act that the Comptroller invalidly attempted to amend Comptroller Rule 3.356. Southern Plastics, however, alleged no controversy beyond whether it is entitled to a refund for taxes paid during the audit period. The district court did not err in granting summary judgment on this claim. *See Universal Painting Co. v. Premier Victorian Homes, Inc.*, 73 S.W.3d 283, 296 (Tex. App.—Houston [1st Dist.] 2001, pet. denied) ("There is no basis for

---

[14] *See* Hearing No. 44.501, Tex. Comptroller of Pub. Accounts, STAR Document No. 200506292H (June 23, 2005).

declaratory relief when a party is seeking in the same action a different, enforceable remedy, and a judicial declaration would add nothing to what would be explicit or express in a final judgment for the enforceable remedy.").

We overrule Southern Plastics's second issue.

## CONCLUSION

Having overruled Southern Plastics's issues on appeal, we affirm the judgment of the district court.

_____

Bob Pemberton, Justice

Before Justices Patterson, Pemberton and Waldrop

Affirmed

Filed:   July 1, 2009

21